UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| IAN WRIGHT, | : | |
|     Plaintiff, | : | |
| | : | |
|   v. | : | Case No. 3:21-cv-01732 (SRU) |
| | : | |
| ROLLIN COOK, et. al., | : | |
|     Defendants. | : | |

**RULING ON MOTION FOR SUMMARY JUDGMENT**

Ian Wright ("Wright") is a sentenced inmate currently incarcerated at Brooklyn Correctional Institution in the custody of the Connecticut Department of Correction ("DOC"). He brought this suit against the defendants, Warden Robert Martin ("Warden Martin"), Deputy Warden Carlos Nunez ("Deputy Warden Nunez"), Lieutenant Jonathan Peau ("Lieutenant Peau"), and Correctional Kitchen Supervisor Thomas Winton ("Kitchen Supervisor Winton") (collectively, the "defendants"). Wright claims the defendants violated the Eighth Amendment due to deliberate indifference to his health and safety while he was incarcerated at Corrigan-Radgowski Correctional Center ("Corrigan") in 2020.

In Count I of his Amended Complaint, Wright claims that the defendants exposed him to unsafe conditions of confinement during the COVID-19 pandemic by failing to enforce mandatory policies that correctional staff wear masks. Am. Compl., Doc. No. 13 ¶¶ 115-117. In Count II, Wright claims that the defendants deprived Wright of food because the defendants did not ensure that correctional staff wore masks when preparing and serving meals to inmates.

1

Wright rejected those meals and alleges that accepting those meals would have exposed him to a greater risk of catching COVID-19. *Id*. ¶¶ 118-125.

The defendants move for summary judgment on the grounds that Wright fails to state a cognizable Eighth Amendment claim and that they are protected by qualified immunity. For the reasons set forth below, I grant the defendants' motion for summary judgment, **doc. no. 78**, on Counts I and II of Wright's Amended Complaint.

**I.    Background**

  A. Procedural History

Wright filed this action *pro se*, and upon initial review, I concluded that Wright's Eighth Amendment claims relating to his conditions of confinement at Corrigan should proceed against the defendants. IRO, Doc. No. 16. During discovery, the defendants produced numerous videos of security footage that Wright had requested from Corrigan in 2020. Ex. I; Doc. No. 78-11; Doc. No. 109 at 2. Subsequently, there were several discovery disputes. On March 22, 2024, Wright filed his first motion for sanctions, alleging spoilation of certain video evidence and requesting that the Court order a spoilation instruction be provided to a jury in the event of a future trial. Doc. No. 48. The defendants objected to Wright's allegations pertaining to spoilation of evidence. Doc. No. 54. I held a status conference, and after hearing argument from the parties and thoroughly reviewing the pleadings, I denied Wright's motion for sanctions. Doc. No. 63.

The defendants filed their Motion for Summary Judgment, Memorandum of Law, and Rule 56(a)(1) Statement of Material Facts. Doc. Nos. 78; 78-1; 78-2. The defendants also submitted numerous video exhibits, declarations from all the defendants, and other records, including Wright's medical records, Unit Logbook Excerpts, and DOC Policy Memos. Exs. A

through I, Doc. Nos. 78-3 through 78-13; 79. Wright submitted a Rule 56(a)(2) Statement of Facts in Opposition to the defendants' Motion for Summary Judgment, along with an affidavit, Memorandum of Law, and 511 pages of exhibits. Doc. Nos. 95; 95-1; 95-2; 95-3. The defendants replied to Wright's opposition, Doc. No. 100, and submitted records of Wright's commissary purchases. Ex. J, Doc. No. 100-1. Wright was granted leave to file a supplemental memorandum. Doc. Nos. 102; 103; 105.

On May 20, 2025, Wright filed a Motion for Sanctions and Motion for Appointment of Expert Witness, Doc. Nos. 107; 108, claiming for the first time that video files CRCC-VP-20-1296 and 20-1371 appeared to be altered by video editing software to "blur Defendant Peau's face during his entire tour in the housing unit." Doc. No. 107 at 5. The defendants objected to Wright's motions and the defendants' counsel, Assistant Attorney General Jacob McChesney, submitted an affidavit attesting that the video footage was not doctored and arguing that Wright had no evidentiary support for those allegations. Doc. Nos. 109; 109-1. After reviewing the video footage, I concluded there was no evidence that the videos were altered. Doc. No. 112. I also emphasized that the videos that Wright claims were altered are numerous, with some over one hour in length, and Wright did not identify with timestamps where in the videos he claimed the footage had been doctored. *Id*. After resolving those disputes, the Motion for Summary Judgment is now ripe for review.

B. Factual Background

The facts are taken from the parties' Local Rule 56(a) Statements[1] and Wright's Amended Complaint.[2] To the extent that Wright has not refuted the defendants' Local Rule 56(a) Statement with specific citations to admissible evidence, the defendants' facts are deemed admitted. *See* D. Conn. L. Civ.211732 R. 56(a)1 ("Each material fact set forth in the Local Rule 56(a)1 Statement and supported by the evidence will be deemed admitted . . . unless such fact is controverted by the Local Rule 56(a)2 Statement required to be filed and served by the opposing party in accordance with this Local Rule.").

1. The Parties

Ian Wright is a sentenced inmate who was confined at Corrigan's Fox Unit from September 2017 to October 2020. Am. Compl., Doc. No. 13 ¶¶ 25, 46. Wright's claims primarily focus on events occurring between April 2020 and July 2020. *See id*. ¶¶ 43-91. During that period, COVID-19 transformed into a global pandemic and an unprecedented health emergency. Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 8.

The four defendants remaining in this case all held supervisory positions at Corrigan during the relevant period. Warden Robert Martin oversaw all operations within Corrigan and

---

[1] Local Rule 56(a)(1) requires a party moving for summary judgment to file "a concise statement of each material fact as to which the moving party contends there is no genuine issue to be tried." D. Conn. L. Civ. R. 56(a)(1). Local Rule 56(a)(2) requires the party opposing summary judgment to submit a Local Rule 56(a)(2) statement that contains separately numbered paragraphs corresponding to the Local Rule 56(a)(1) statement and indicating whether the opposing party admits or denies the facts set forth by the moving party. D. Conn. L. Civ. R. 56(a)(2). Each denial must include a specific citation to an affidavit or other admissible evidence. D. Conn. L. Civ. R. 56(a)(3). The defendants informed Wright of this requirement. Doc. No. 78-12 ("Notice to Self-Represented Litigant Concerning Motion for Summary Judgment as Required by Loc. R. of Civ. Pro. 56(b)"). Wright has submitted a Local Rule 56(a)(2) statement. Doc. No. 95.

[2] At the summary judgment stage, a verified complaint can be treated as an affidavit. But "the allegations contained therein can suffice to defeat summary judgment only insofar as they were made on personal knowledge." *Curtis v. Cenlar FSB*, 654 F. App'x 17, 20 (2d Cir. 2016) (Summary Order).

Deputy Warden Carlos Nunez assisted Warden Martin. Am. Compl., Doc. No. 13 ¶¶ 13, 16. Lieutenant Jonathan Peau managed Corrigan's Fox Unit, where Wright was confined. *Id*. ¶ 17. Food Supervisor Thomas Winton oversaw the staff and inmates working in Corrigan's kitchen. *Id*. ¶ 22.

2. COVID-19 Policies at Corrigan

The DOC responded to the COVID-19 pandemic with various measures to limit the spread of COVID-19. *See* Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 5. Department of Correction Commissioner Rollin Cook ("Commissioner Cook") largely directed those measures, which were instituted and updated based on applicable CDC guidelines for correctional facilities and the recommendations of health professionals. *See id*. On April 1, 2020, Commissioner Cook issued a memo to all DOC staff, indicating that the DOC had instituted Phase 3 of its COVID-19 Operational Response Plan at Corrigan. *Id*. ¶ 10; s*ee also* DOC Policy Memos, Ex. G, Doc. No. 78-9 at 2-4. The DOC placed Corrigan on lockdown and instituted a variety of measures to combat the spread of COVID-19. *See generally* Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2.[3]

Corrigan also implemented measures to detect COVID-19 infections in staff. Those measures included temperature checks of staff in the lobby prior to their shifts, mandatory self-reporting of COVID-19 symptoms either prior to or during their shifts, and repetition of staff

---

[3] Those measures included requiring meals to be served and consumed in inmates' individual cells, staff to wear personal protective equipment ("PPE") during food service, laundry, and other duties in any area housing symptomatic inmates, legal visits to be cancelled, suspension of recreation, and limitations on the number of inmates permitted to be outside their cells at any given time. Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶¶ 10-13; s*ee also* DOC Policy Memos, Ex. G, Doc. No. 78-9 at 4. Wright disputes that Corrigan required staff to wear PPE when conducting feeding, laundry, and other duties in any area housing symptomatic inmates. Pl.'s L.R. 56(a) Stmt., Doc. No. 95 ¶ 11. However, that part of the policy is reflected in the April 1, 2020 DOC Policy Memo. *See* DOC Policy Memos, Ex. G, Doc. No. 78-9 at 4.

5

temperature checks during their shifts. *Id*. ¶ 17. Staff who exhibited a high temperature or reported symptoms were not permitted to work or had to leave the facility.[4] *Id*. ¶ 17. In April 2020, the DOC instituted an agency-wide policy that all staff wear face masks while on duty when unable to practice social distancing. The DOC also distributed face masks to the entire inmate population and required inmates to wear face masks when exiting cells and in common areas. *Id*. ¶ 14; *see also* DOC Policy Memos, Ex. G, ECF No. 78-9 at 4-10.

The DOC also developed procedures to respond to the spread of COVID-19 among inmates. Any inmates who exhibited symptoms or tested positive for COVID-19 were transferred either to a specialized unit at Corrigan or to Northern Correctional Institution for quarantine and medical monitoring. Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 15.[5] Inmates were not permitted to remain in their housing unit if they exhibited COVID-19 symptoms or tested positive for COVID-19. *Id*.

In May 2020, the DOC began mass testing of inmates regardless of reported symptoms. *Id*. ¶ 21. On May 20, 2020, Wright also "received the first of many COVID-19 test[s] and the results [were] negative." Am. Compl., Doc. No. 13 ¶ 59; *see also* Pl.'s Med. Rec., Ex. E, Doc. No. 79 at 27-28. "Thereafter, [Wright] received COVID-19 testing while at Corrigan every other

---

[4] Wright claims that data suggests that around 60% of COVID-19 cases are asymptomatic, and therefore, fevers and symptoms were not a reliable indicator of whether someone is a carrier of COVID-10. Pl.'s L.R. 56(a) Stmt., Doc. No. 95 ¶ 17. In support of that claim, Wright refers to information provided from cdc.gov/coronavirus and Executive Order No. 7BB. *See* Pl.'s Ex. 1, Doc. No. 95-3 at 5-45; Pl.'s Ex. 2, Doc. No. 95-3 at 42-45. Although I will consider that information, I do not find it to be probative of whether Corrigan took adequate measures to prevent the spread of COVID-19.

[5] Wright claims that COVID-19 protocols at Corrigan during 2020 were inadequate and transferring inmates after they tested positive for the virus did not mitigate the spread of the virus among those inmates who remained in the facility. Pl.'s L.R. 56(a) Stmt., Doc. No. 95 ¶ 15. That assertion lacks evidentiary support.

week until he [was] transferred to [another facility] on October 22, 2020, [and] all tests were negative." Am. Compl., Doc. No. 13 ¶ 59; *see also* Pl.'s Med. Rec., Ex. E, Doc. No. 79 at 3-6.

DOC policy required inmate workers and staff members to wear masks and other sanitary coverings while preparing and handling food, to wash their hands, and to cease work in the kitchen and quarantine if they showed symptoms of COVID-19. Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 27; Winton Aff., Ex. D, Doc. No. 78-6 ¶ 8. For meal services, kitchen staff prepared inmate meal trays and placed those trays in carts to be transported to the units and distributed to each cell, with a unit officer accompanying the inmate worker to each cell. Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 29. DOC policy required the officer and inmate worker to be masked during that process. Peau Aff., Ex. C, Doc. No. 78-5 ¶ 14.

3. Wright's COVID-19 Concerns and Corrigan's Response

On April 17, 2020, Wright sent three separate request forms to Warden Martin, Lieutenant Peau, and Commissioner Cook, notifying them that prison officials at Corrigan refused to wear masks and practice social distancing, particularly while serving inmate meals, and requesting that they require compliance with COVID-19 protocols. Pl.'s L.R. 56(a) Stmt., Doc. No. 95 ¶ 30; Inmate Request Forms, Pl.'s Ex. 4, Doc. No. 95-3 at 52-54. Warden Martin responded by letter on May 11, 2020. Letter Attach. to Martin Aff., Ex. A, ECF No. 78-3 at 12. Lieutenant Peau responded to Wright's grievance on May 13, 2020, stating "I spoke to the officers in the unit about this issue[] to ensure that this is being done[.] A memo was posted." Grievance Response Attach. to Peau Aff., Ex. C, Doc. No. 78-5 at 11. Wright claims that after he received a response from Lieutenant Peau, prison officials, including Lieutenant Peau, continued to refuse to wear masks and practice social distancing while on duty. Pl.'s L.R. 56(a) Stmt., Doc. No. 95 ¶ 31.

At the end of May 2020, many inmates in the Fox Unit began refusing their state-issued meals, including Wright. Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 32. On May 28, 2020, Warden Martin, Deputy Warden Nunez, and Lieutenant Peau went to the Fox Unit to assess the inmates' refusal to accept state-issued meals. *Id*. ¶ 32; *see also* Wright Aff., Doc. No. 95-1 ¶ 28. Subsequently, the other inmates began accepting state-issued meals, except for Wright and his cellmate. *Id*. ¶ 32. Wright claims that, while being interviewed in the counselor's office, he told Warden Martin, Deputy Warden Nunez, and Lieutenant Peau it would be safer to refuse state-issued meals after witnessing prison officials' refusal to wear masks and practice social distancing. Pl.'s L.R. 56(a) Stmt., Doc. No. 95 ¶ 32.

On May 29, 2020, because Wright had missed several meals, a nurse visited Wright in his cell and took his vital signs. Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 34. The nurse noted that Wright had a normal blood glucose level with no signs or symptoms of acute distress. The nurse then logged his height at 74 inches, his BMI as 27.10, and his weight as 210.3 pounds. *Id*.; *see also* Pl.'s Med. Rec., Ex. E, Doc. No. 79 at 26.

On May 30, 2020, one of the nurses interacted with Wright and indicated that "Custody reports inmate has commissary in cell. Inmate has no complaints." Pl.'s Med. Rec., Ex. E, Doc. No. 79 at 25. At the start of June, Wright was logged as "hunger strike." Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 33. On June 2, 2020, mental health staff visited Wright and noted the presence of commissary food in his cell. *Id*. ¶ 35.

Deputy Warden Nunez went to Fox Unit with Medical Supervisor Phillips at the medical staff's request to help them assess whether Wright was on a true hunger strike or simply refusing state-issued meals. *Id*. ¶ 36; *see also* Pl.'s Med. Rec., Ex. E, Doc. No. 79 at 16-17. The staff, including Deputy Warden Nunez, wore face masks. Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶

8

38; *see also* Ex. I, Doc. No. 78-11, VP-20-0745(3) at 28:50.  Medical Supervisor Phillips took Wright's vital signs, which were normal.  Pl.'s Med. Rec., Ex. E, Doc. No. 79 at 17.  She also documented that Wright had a note on his cell door stating he was on hunger strike, however, Wright stated he was "eating commissary[,]" and he eventually ate some peanut butter in front of Deputy Warden Nunez to prove he was not on a true hunger strike.  *Id*. at 15-16; *see also* Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 37.  Staff continued to note that Wright refused his meal trays through July 9, 2020.  Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 39; Logbook, Pl.'s Ex. 7, Doc. No. 95-3 at 131-177.

On July 6, 2020, a correctional officer assigned to Wright's pod informed Wright that Commissioner Cook, Warden Martin, and Deputy Warden Nunez had required that subordinates wear masks or face coverings, especially when serving and preparing meals.  Am. Compl., Doc. No. 13 ¶ 89.  Shortly after receiving that information, Wright noticed a significant change in the behavior of Corrigan's staff concerning the wearing masks or facial coverings when social distancing was not possible.  *Id.* ¶ 90.  As a result of that change, Wright began accepting state-issued meals on July 10, 2020.  *Id*. ¶ 91; Pl.'s L.R. 56(a) Stmt., Doc. No. 95 ¶ 39; Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 39.  Wright claims he lost approximately twenty-five pounds during the time he refused state-issued meals.  Am. Compl., Doc. No. 13 ¶ 123.  While at Corrigan, Wright never caught COVID-19, and was tested for COVID-19 several times, each with a negative result.  Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 47.

## II.   Standard of Review

A motion for summary judgment may be granted only where there is no genuine dispute regarding any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.,* 875 F.3d 107, 113 (2d Cir.

2017). "A genuine issue of material fact exists if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Nick's Garage*, 875 F.3d at 113-14 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In considering a motion for summary judgment, a court "must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Kee v. City of New York*, 12 F.4th 150, 158 (2d Cir. 2021) (cleaned up).

The moving party bears the initial burden of informing the court of the basis for its summary judgment motion. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party "demonstrates the absence of a genuine issue of material fact," the nonmoving party must set forth "specific evidence demonstrating the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011) (cleaned up).

All assertions of material fact in the movant's affidavits will be taken as true by the district court unless the *pro se* litigant contradicts those factual assertions by providing an affidavit made on personal knowledge that contains facts that would be admissible in evidence. *McPherson v. Coombe*, 174 F.3d 276, 282 (2d Cir. 1999). If the nonmovant's affidavit fails to properly support or address a fact on motion for summary judgment, because it is conclusory or not based on the affiant's personal knowledge, the affidavit is insufficient to defend against a motion for summary judgment. *Knox v. CRC Mgmt. Co., LLC*, 134 F.4th 39 (2d Cir. 2025); *see* Fed. R. Civ. P. 56(c)(4). In other words, the nonmoving party must present evidence that would allow a reasonable juror to find in his favor. *Graham v. Long Island R.R.*, 230 F.3d 34, 38 (2d Cir. 2000).

Finally, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt

that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris,* 550 U.S. 372, 380 (2007). Similarly, "[w]here the parties present conflicting versions of an incident and video evidence of the incident has been submitted on a motion for summary judgment, the court must view the facts 'in the light depicted by the video' of the incident." *Olivencia v. Pun,* 2022 WL 4329343, at *2 n.3 (D. Conn. Sept. 19, 2022) (quoting *Scott,* 550 U.S. at 380–81 (2007)).

### III.  Discussion

Counts 1 and 2 of the Amended Complaint allege that the defendants were deliberately indifferent to Wright's health and safety in violation of the Eighth Amendment. *See* Am. Compl., Doc. No. 13 ¶¶ 115-125. The Eighth Amendment, which forbids cruel and unusual punishment, has been interpreted to prohibit conditions in state prisons that subject incarcerated individuals to the "wanton and unnecessary infliction of pain." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). The ban on cruel and unusual punishment "does not mandate comfortable prisons, but neither does it permit inhumane ones." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994) (internal quotation marks and citations omitted). An Eighth Amendment claim related to the conditions of an inmate's confinement, often referred to as a "deliberate indifference" claim, is comprised of objective and subjective elements. *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998).

Objectively, an inmate must be deprived of a "basic human need," or be subjected to a "substantial risk of serious harm" to health or safety. *Rhodes*, 452 U.S. at 347; *Farmer*, 511 U.S. at 834. Conditions are objectively serious enough to implicate the Eighth Amendment where, alone or in combination, they produce "deprivation of a single, identifiable human need such as food, warmth, or exercise." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991). There is no bright-line

11

rule or "static test to determine whether a deprivation is sufficiently serious; the conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012) (internal quotation marks and citations omitted). Finally, though plaintiffs need not demonstrate actual physical injury or harm to successfully bring an Eighth Amendment claim, "the absence of present physical injury will often be probative in assessing the risk of future harm." *Smith v. Carpenter*, 316 F.3d 178, 187 (2d Cir. 2003).

To meet the subjective element, an inmate must show that the defendants possessed culpable intent; that is, the defendants knew that the inmate faced a substantial risk to his health or safety and disregarded that risk by failing to take corrective action. *See Farmer*, 511 U.S. at 834, 837. The defendants "must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and [they] must also draw the inference." *Id.* at 837. Allegations of "mere negligence" are insufficient to plead a deliberate indifference claim. *See Wilson*, 501 U.S. at 305. Rather, a plaintiff must provide evidence to support a claim that a defendant knew of and disregarded a serious risk of harm to his health and wellbeing. *See Tangreti v. Bachman*, 983 F.3d 609, 619 (2d Cir. 2020).

A. <u>Count I (Eight Amendment Conditions of Confinement - General COVID-19 Exposure)</u>

Wright's first claim alleges that the defendants exposed him to unsafe conditions of confinement by failing to enforce mask policies for correctional officers during the COVID-19 pandemic. Am. Compl., Doc. No. 13 ¶¶ 115-117, 119-121, 125. Considering the steps taken by the defendants to curb the spread of COVID-19, Wright's inability to produce any evidence of specific instances of increased exposure or infection, and the defendants' lack of personal involvement, there is no genuine dispute of material fact regarding the objective element of whether COVID-19 at Corrigan presented a substantial risk of serious harm to Wright.

12

"[C]orrectional officials have an affirmative obligation to protect inmates from infectious disease." *Jolly v. Coughlin*, 76 F.3d 468, 477 (2d Cir. 1996). This obligation extends to the risks posed by COVID-19 because "[i]t is also undisputed…that COVID-19 is a highly dangerous disease that poses a significant risk of severe illness and death." *Martinez-Brooks v. Easter*, 459 F. Supp. 3d 411, 440 (D. Conn. 2020). But, to find that prison conditions during the COVID-19 pandemic posed an unreasonable risk of serious harm to an inmate's health, courts have required evidence of "specific instances of increased exposure, positive tests, or evidence of an underlying medical condition." *Smith v. Sullivan*, 2023 WL 3727447, at *14 (N.D.N.Y. May 3, 2023).

Wright does not meet the standard for the objective element. First, Wright pleads no allegations nor presents any evidence showing that he was a particularly vulnerable inmate with a significant underlying medical condition while he was housed at Corrigan. *See Brown v. City of New York*, 2023 WL 2908661, at *10 (S.D.N.Y. Jan. 30, 2023), *R & R adopted*, 2023 WL 2496089 (S.D.N.Y. Mar. 14, 2023) (concluding plaintiff failed to show that a genuine issue of material fact existed because he was screened for COVID-19 at least 17 times, and tested negative three times, and had not shown he had a condition that put him at an increased risk of serious illness should he be infected). Second, the facts also confirm that Wright did not test positive for COVID-19 while he was housed at Corrigan. *See* Am. Compl., Doc. No. 13 ¶ 59; *see also* Pl.'s Med. Rec., Ex. E, Doc. No. 79 at 3-6, 27-28. In Wright's Amended Complaint, he asserts that on May 20, 2020, he "received the first of many COVID-19 test[s] and the results [were] negative . . . [and] [t]hereafter [he] received COVID-19 testing while at Corrigan every other week until he [was] transferred on . . . October 22, 2020, all test results were negative." Am. Compl., Doc. No. 13 ¶ 59.

But Wright's inability to present evidence of specific instances of COVID-19 exposure or infection is not the end of the inquiry regarding the objective element. "A plaintiff can certainly raise a claim under the Eighth Amendment based on risks that have not manifested themselves in any adverse health outcome." *Chunn v. Edge*, 465 F. Supp. 3d 168, 200 (E.D.N.Y. 2020); *see also Helling v. McKinney*, 509 U.S. 25, 33 (1993) ("Nor can we hold that prison officials may be deliberately indifferent to the exposure of inmates to a serious, communicable disease on the ground that the complaining inmate shows no serious current symptoms."). Accordingly, I must also examine the measures that the prison implemented to stop the spread of COVID-19. *See Pierce v. Rodriguez*, 2023 WL 2646825, at *8 (D. Conn. Mar. 27, 2023). "COVID-19 can pose a substantial risk of serious harm to prisoners if the prison fails to take adequate measures against the spread of the virus." *Hackett v. Rodriguez*, 2022 WL 16949369, at *7 (D. Conn. Nov. 15, 2022); *see also Chunn*, 465 F. Supp. 3d at 201.

The defendants present ample evidence of measures taken to address the threat posed by COVID-19. Those steps included implementing medical policies, such as transferring COVID-19 positive and symptomatic inmates to a specialized unit at Corrigan for quarantine and requiring staff to report symptoms and check their temperatures prior to work. Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶¶ 15, 17. The defendants also aimed to increase social distancing in Corrigan, by restricting the medical unit to essential movement, *id*. ¶ 13, suspending group recreation, *id*. ¶ 12, and moving meal service to inmates' individual cells. *Id*. ¶¶ 10, 29.

Lastly, "[i]t is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quoting *Moffitt v. Town of Brookfield*, 950 F.2d 880, 885 (2d Cir. 1991)). Although Wright alleges that the defendants failed to enforce

14

DOC masking policy among their subordinate employees, Wright cannot rely on the mere fact of their supervision of the noncompliant subordinate employees to establish liability. *Tangreti,* 983 F.3d at 619. Instead, Wright must either establish that the defendants violated the Eighth Amendment by their own conduct or that the defendants created, adopted, perpetuated, or enforced an unconstitutional policy. *See id*. at 619; *Reynolds v. Arnone*, 2025 WL 974843, at *11 (D. Conn. Mar. 31, 2025); *Harnage v. Dzurenda*, 2022 WL 972438, at *2 (D. Conn. 2022).

Wright is not able to overcome those hurdles. Regarding the defendants' personal involvement, aside from his attestation that Lieutenant Peau failed to wear a mask, Wright never proffers any affirmative evidence that the defendants personally exposed him to unreasonable conditions of COVID-19. Regarding the enforcement of an unconstitutional policy, Wright only alleges non-enforcement of an otherwise constitutional policy meant to protect inmates from COVID-19 exposure and infection.

Considering the countermeasures and Wright's lack of evidence regarding the defendants' personal involvement or specific instances of COVID-19 infection or exposure, I conclude that there are no genuine disputes of fact regarding whether the defendants subjected Wright to a substantial risk of serious harm through the conditions of his confinement during the pandemic. *See Gibson v. Rodriguez*, 2021 WL 4690701, at *6 (D. Conn. Oct. 7, 2021) ("The court…concludes that following the CDC guidelines is sufficient to negate any finding that Gibson was subjected to conditions posing a substantial risk of serious harm.").

Even if Wright could meet the objective prong of his deliberate indifference claim pertaining to unsafe conditions of confinement, the undisputed facts show that he cannot meet the subjective prong. Wright fails to establish that the defendants acted with the requisite intent. Far from offering evidence that each defendant "personally knew of and disregarded an

15

excessive risk" to Wright's health and safety, *Tangreti*, 983 F.3d at 616, the undisputed facts show that the defendants implemented the DOC's protocols and responded to Wright's concerns. In a letter dated May 13, 2020, Lieutenant Peau assured Wright that "[he] spoke to the officers in the unit about this issue to ensure that this is being done[.] A memo was posted." Grievance Response Attach. to Peau Aff., Ex. C, Doc. No. 78-5 at 11.  In a letter dated May 11, 2020, Warden Martin explained to Wright that "[t]he actions that we are taking are aimed at keeping staff and inmates safe and secure during the pandemic and are in accordance with Centers for Disease Control guidelines for correctional and detention facilities." Letter Attach. to Martin Aff., Ex. A, Doc. No. 78-3 at 12.  Moreover, after the defendants reviewed the videos that Wright had requested to preserve, Wright acknowledges that the defendants "made a deliberate and conscious choice after having knowledge of their conduct, to implement policies that would make it mandatory for [staff] to adhere to the CDC guidelines as it relates to COVID-19 preventative measures." Am. Compl., Doc. No. 13 ¶ 86.

As a final note, Wright did have valid concerns about how the DOC responded to the COVID-19 pandemic.  The defendants acknowledge that the preserved videos depict officers without masks in the Fox Unit. *See* Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 48.  In his verified complaint, Wright maintained that his initial request for a face mask was rejected and did not receive a face mask until early April 2020.  *See* Am. Compl., Doc. No. 13 ¶ 43, 47. Wright also alleges that inmates at Corrigan had minimal access to disinfectant and cleaning supplies. *Id*. ¶¶ 40-41.  The COVID-19 response at Corrigan was undoubtedly imperfect. But in this case, the imperfect response was not an unconstitutional one.  The COVID-19 pandemic was "an unprecedented health emergency that presented unique health and safety concerns for correctional population management." Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 8.  Given that

emergency context, other courts have described similarly imperfect COVID-19 responses as "negligent errors in implementing a new policy under emergency conditions," and not as constitutional violations. *Chunn*, 465 F. Supp. 3d at 203.

Therefore, I conclude that the evidence demonstrates that the defendants were not deliberately indifferent to Wright's COVID-19 concerns and are entitled to summary judgment on Count I of Wright's Amended Complaint.

B. Count II (Eighth Amendment Conditions of Confinement - Food Deprivation)

I also conclude that the undisputed facts show that Wright cannot sustain an Eighth Amendment claim for deliberate indifference pertaining to food deprivation, and defendants are entitled to judgment as a matter of law on Count II of Wright's Amended Complaint.

The Eighth Amendment requires "nutritionally adequate food that is prepared and served under conditions which do not present an immediate danger to the health and well–being of the inmates who consume it." *Robles v. Coughlin*, 725 F.2d 12, 15 (2d Cir. 1983) (internal quotation marks and citations omitted). But "[b]ecause society does not expect or intend prison conditions to be comfortable, only *extreme* deprivations are sufficient to sustain a conditions-of-confinement claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (emphasis added). "Therefore, courts impose a high bar to success on a conditions of confinement claim based on a theory that the food provided in a prison or jail was inadequate." *Rombousek v. Trinity Co.*, 2022 WL 2343236, at *4 (S.D.N.Y. June 29, 2022).

Regarding the objective component of Wright's food deprivation claim, the record reflects that Wright was not deprived of adequate food, but instead, refused to eat what was provided. *See Robinson v. Rodriguez*, 2025 WL 2173994, at *7 (D. Conn. July 31, 2025) (concluding that the plaintiff did not suffer a substantial food deprivation where he rejected the

trays provided to him after being informed "that the trays were for the regular meal plan and not for a no-soy diet").

Moreover, Wright presents no evidence that the alleged deprivation caused any serious risk to his health. Although Wright claims to have lost twenty-five pounds during the approximate five-weeks of his refusal to accept DOC-issued trays, he does not offer any further evidence of how that weight loss created a risk to his health. *See Constant v. Prack*, 2019 WL 3287818, at *3, 15 (S.D.N.Y. July 19, 2019) (A conclusory allegation that the Plaintiff lost a significant amount of weight—or even that he lost 15 pounds in one month and 26 pounds in two months—may not by itself show that those conditions posed an unreasonable risk of serious damage to the plaintiff's health when defendants took action to address the deficiencies.); *Morales v. City of New York for Riker's Island*, 2022 WL 799729, at *7 (S.D.N.Y. Mar. 16, 2022) (dismissing plaintiff's unsanitary food service claim alleging that an inmate failed to take sanitary precautions after using the toilet and while serving food because the plaintiff had not alleged, in part, any specific consequences to his health).

Even if Wright did sustain an objectively serious food deprivation, the undisputed facts and evidence still fail to support an inference that the defendants acted with deliberate indifference. Once the defendants learned that Wright was refusing his DOC-issued meals, the defendants consistently monitored Wright to ensure that his refusal to accept DOC-issued meals did not pose a substantial risk or danger to his health. For example, on June 4, 2020, Deputy Warden Nunez personally visited Wright with a medical supervisor to assess whether Wright was on a true "hunger-strike." During that visit, Wright ate peanut butter and told staff he was eating food from the commissary. Defs.' L.R. 56(a)(1) Stmt., Doc. No. 78-2 ¶ 37; Pl.'s Med.

Rec., Ex. E, Doc. No. 79 at 15-16.  Corrigan medical and mental health staff also monitored Wright during that period.  *See* Pl.'s Med. Rec., Ex. E, Doc. No. 79 at 20-26.

When considering all the steps the defendants took to ensure that Wright's refusal to accept DOC-issued meals did not pose a substantial danger to his health, there can be no inference that the defendants were deliberately indifferent, and I must grant summary judgment for the defendants on Count II of Wright's Amended Complaint.  *See Burrell v. DOCCS*, 655 F. Supp. 3d 112, 127 (N.D.N.Y. 2023) (dismissing plaintiff's Eighth Amendment claim where he had not alleged he suffered any injury as a result of his hunger strike and his vague allegations of weight loss were insufficient to sustain his claim); *Sawyer v. Prack*, 2014 WL 12923403, at *7 (N.D.N.Y. Dec. 31, 2014) ("Plaintiff refused to eat for sixteen days and while he makes vague assertions regarding his weight loss, those claims are insufficient to plausibly suggest an Eighth Amendment claim as against any defendant.").  In summary, because I conclude that Wright has failed to show a constitutional violation, I grant the defendants' summary judgment motion on Count II of Wright's Amended Complaint.[6]

### IV.   Conclusion

For the foregoing reasons, I **grant** the defendants' motion for summary judgment, **doc. no. 78**, on Counts I and II of Wright's Amended Complaint.  The clerk is instructed to enter judgment for the defendants and to close this case.

So ordered.

---

[6] Because I have granted the defendants' motion for summary judgment on Wright's claims, I need not address the defendants' qualified immunity argument. *See Duamutef v. Hollins*, 297 F.3d 108, 113 n.1 (2d Cir. 2002) ("That is, once we decide that there is no constitutional violation, there typically is no need to address whether defendants are also protected by qualified immunity—although qualified immunity becomes obvious at that point.").

Dated at Bridgeport, Connecticut, this 21st day of October 2025.

/s/ STEFAN R. UNDERHILL
Stefan R. Underhill
United States District Judge